**Marquis & Aurbach**
CRAIG R. ANDERSON, ESQ.
Nevada Bar No. 6882
10001 Park Run Drive
Las Vegas, Nevada 89145
Telephone: (702) 382-0711
Facsimile: (702) 382-5816
canderson@marquisaurbach.com
Attorneys for Defendant T. Crumrine

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| LAURIE TSAO a/k/a LAURIE CHANG,<br><br>               Plaintiff,<br><br>   vs.<br><br>DESERT PALACE, INC.; T. CRUMRINE and<br>DOES I-XX, jointly and severally,<br><br>               Defendants. | Case No:    2:08-cv-00713-RCJ (GWF) |

## <u>DEFENDANT T. CRUMRINE'S MOTION FOR SUMMARY JUDGMENT</u>

Defendant Travis Crumrine (hereinafter "Ofc. Crumrine"), by and through his counsel of record, Marquis & Aurbach, moves this Court for summary judgment on all claims pursuant to Federal Rule of Civil Procedure 56. This Motion is made and based upon all papers, pleadings and records on file herein, the attached Points & Authorities, and such oral argument, testimony and evidence as the Court may entertain.

MARQUIS & AURBACH

By: _____
Craig R. Anderson, Esq.
Nevada Bar No. 6882
10001 Park Run Drive
Las Vegas, Nevada 89145
Attorneys for LVMPD Defendants

/ / /

/ / /

/ / /

MARQUIS & AURBACH
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

# MEMORANDUM OF POINTS & AUTHORITIES

## I.   INTRODUCTION

Defendant Travis Crumrine ("Ofc. Crumrine") is a peace officer with the Las Vegas Metropolitan Police Department ("LVMPD").   On March 19, 2008, Ofc. Crumrine was dispatched to Caesar's Palace to investigate a citizen's arrest of an unidentified female (later identified as Plaintiff Laurie Tsao ("Plaintiff")).  Caesar's Palace informed Ofc. Crumrine that it had trespassed Plaintiff on numerous occasions under several different aliases and that Caesar's wanted Plaintiff positively identified.  Plaintiff attempted to conceal her true identity from Ofc. Crumrine by answering his questions with half-truths and outright lies.  In fact, at no time during the investigation did Plaintiff ever tell Ofc. Crumrine her true legal name.  As such, Ofc. Crumrine was forced to spend unnecessary time performing detective work to simply identify Plaintiff.   Once Plaintiff was identified as "Laurie Tsao," Caesar's Palace arrested her for trespassing.  In addition, because of Plaintiff's purposeful attempts to hinder, delay and obstruct Ofc. Crumrine's lawful attempt to ascertain her identity, Ofc. Crumrine also arrested Plaintiff for Obstruction of a Police Officer.  Plaintiff is now suing, claiming both arrests violated her constitutional rights.

Plaintiff's Complaint, filed on May 9, 2008, asserts various federal claims premised under 42 U.S.C. § 1983, and state law claims against Ofc. Crumrine.  A close reading of the Complaint indicates that pursuant to 42 U.S.C. § 1983, Plaintiff is alleging that Ofc. Crumrine: (1) violated Plaintiff's Fourth Amendment rights by falsely arresting her without probable cause (Compl. ¶¶ 72, 74, and 78); (2) violated Plaintiff's Fifth Amendment right (via the Fourteenth Amendment) by violating Plaintiff's Miranda rights (id. ¶ 72); (3) violated her due process rights by failing to properly investigate the situation (Compl. ¶74); (4) violated Plaintiff's equal protection rights by engaging in selective prosecution (Compl. ¶¶ 69-70); and (5) engaged in a civil conspiracy with Caesar's Palace (Id. ¶ 76).  In addition, Plaintiff seeks recovery sounding in state law tort against Ofc. Crumrine.  Specifically, Plaintiff alleges: (1) battery (id. at Second Cause of Action); (2) false imprisonment (id. at Third Cause of Action); (3) intentional infliction of emotional distress (id. at Fourth Cause of Action); and (4) defamation (id. at Sixth Cause of

M&A:05166-307 746759_1.DOC 2/24/2009 9:37 AM

1 Action).

2     Plaintiff is requesting both compensatory damages and punitive damages against Ofc.

3 Crumrine. Ofc. Crumrine denies all of the above allegations. In addition, Ofc. Crumrine raises

4 the affirmative defense of qualified immunity.

5 ## II.   STATEMENT OF UNDISPUTED FACTS PURSUANT TO LR 56-1

6 ### A.   THE PLAINTIFF

7 #### 1.   Plaintiff's "Most Pertinent" Name and Relevant Background

8     Plaintiff is highly educated with a master's degree from U.C. Irvine. (See Deposition

9 Transcript of Laurie Tsao attached hereto as **Exh. "A"** at pg.14)[1] [2] For the past fifteen (15) years

10 she has worked as a professional gambler. (Id. at pg. 18) Plaintiff characterizes herself as an

11 "advantage gambler" which means that she plays a "positive game at the game of blackjack."

12 (Id. at pg. 146) In short, Plaintiff is a "card counter." Although "card counting" is legal,

13 Plaintiff understands that most casinos "don't like it" and that casinos routinely trespass card

14 counters from casino premises. (Id. at pg. 148) Plaintiff understands that casinos do not want

15 her business and will trespass her from the property if she is identified. (Id.) Plaintiff agrees that

16 casinos have the legal right to trespass her from the property but adds "it's not fair." (Id. at pg.

17 152) Therefore, when Plaintiff patronizes a casino she uses disguises and false names to conceal

18 her true identity. (Id. at pgs. 148-49; 160)

19     Due to Plaintiff's attempts to hide her true identity her actual legal name is a key issue in

20 this litigation. According to Plaintiff's Complaint, her name is "Laurie Tsao, a/k/a Laurie

21 Chang." (See Compl. Caption) Plaintiff's maiden name is "Laurie Cao." However, in 1990 she

22 changed the spelling of her last name (not the pronunciation) to "Tsao" to avoid mis-

23 pronunciation. (Exh. "A" at pg. 14) Plaintiff admits that: (1) her Nevada driver's license is

24 under the name "Laurie Tsao" (id. at pg. 20); (2) her bank account and credit cards are under the

25 name "Laurie Tsao" (id. at pg. 24); (3) her Nevada health card obtained in 2006 is under "Laurie

---

[1] "Tsao" and "Cao" are pronounced the same. (Exh. "A" at pgs. 20-21)

[2] All attached exhibits are properly authenticated in the Affidavit of Craig R. Anderson, Esq. attached at the beginning of the exhibits.

M&A:05166-307 746759_1.DOC 2/24/2009 9:37 AM

MARQUIS & AURBACH
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

Tsao" (id.); and (4) her social security card lists her name as "Laurie Tsao" (id. at pg. 30). Also, Plaintiff does all of her business and investment work under the name of "Laurie Tsao." (Id. at pg. 144) Finally, even Plaintiff admits "Laurie Tsao" is her "most pertinent name." (Id. at pg. 160)

In 2001, Plaintiff married John Chang. (Id. at pg. 16) At her deposition, Plaintiff testified that her current legal name is "Laurie Tsao Chang." (Id. at pg. 141) However, Plaintiff admits that since marrying John Chang, she has never petitioned to have her name legally changed as required by NRS 41.270. (Id. at pg. 142) In fact, Plaintiff acknowledges that only her United States passport states her name is "Laurie Chang." (Id. at pg. 25) This piece of identification is suspect as Plaintiff candidly admits she "has friends" who create fraudulent passports with fictitious names to help her hide her true identity. (Id. at pgs. 65, 142 and 198) Nonetheless, Plaintiff claims that her U.S. passport is legitimate. (Id. at pg. 142) Despite this ambiguity, it is undisputed that Plaintiff has never taken any steps to legally change her name to "Laurie Chang" and the majority of Plaintiff's legal records identify her as "Laurie Tsao."

> **2.** **Plaintiff Admits She Attempts to Conceal Her Most "Pertinent Name"**

Due to the inherent risks of "card counting," Plaintiff never takes any identification into a casino, and gambles under numerous fictitious names. (Id. at pg. 155) Plaintiff admits she is fine with the casinos knowing her as "Laurie Chang." However, she does not want them to identify her as "Laurie Tsao" because "that [is] the most pertinent name." (Id. at pg. 160) In fact, Plaintiff testified as follows:

> Q: And I think one of the things we've established here today is, in your profession, it's important to conceal your identity as best as possible in a casino?
>
> A: Indeed.
>
> Q: So you didn't want the casino knowing you as Laurie Tsao?
>
> A: Laurie Tsao disappeared forever.
>
> Q: She has disappeared forever?
>
> A: Yes.
>
> Q: Except for on your driver's license?

M&A:05166-307 746759_1.DOC 2/24/2009 9:37 AM

MARQUIS & AURBACH
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

1    A:    Right.

2    (Id. at pg. 160)  In truth, "Laurie Tsao" only disappears once she enters a casino, as all her

3    relevant legal documents and business ventures are in the name of "Laurie Tsao." (See Exh. "A"

4    at pgs. 20-30).

5         Plaintiff admits that when she gambles she uses friends' names, fictitious names, family

6    members' names, and strangers' names.  (Id. at pgs. 35-70)  Plaintiff even admits that she uses

7    fraudulent passports as identification and will use players' cards of others that she finds at the

8    casino as identification.   (Id. at pgs. 55 and 65)  In sum, Plaintiff is a card counter who

9    purposefully attempts to conceal her true identity and refuses to identify herself as "Laurie Tsao"

10   while in a casino.

11   **B.    PLAINTIFF'S PRIOR TRESPASSES**

12        Defendant Desert Palace, Inc. owns and operates Caesar's Palace and several other

13   gaming properties. (See Court Doc. #5 at ¶¶2 and 3)  Prior to March 19, 2007, Plaintiff had been

14   trespassed from Caesar's Palace a minimum of three times.  According to Nevada's trespass law,

15   NRS 207.200, it is unlawful for any person to return or remain "upon any land or in any building

16   after having been warned by the owner or occupant thereof not to trespass. . ."  See NRS

17   207.200(1)(b).   If a person does so, the individual is "guilty of a misdemeanor."  See id.

18   Although Plaintiff does not agree with Nevada's trespass laws, she does understand them and the

19   sanctions for ignoring the law. (See Exh. "A" at pgs. 81 and 152)

20        **1.    Plaintiff's February 12, 2006 Trespass at Caesar's Palace**

21        Plaintiff admits that on February 12, 2006, she received a trespass warning from Caesar's

22   Palace. (Exh. "A" at pg. 75)  According to the Caesar's Palace security report, Plaintiff, her

23   husband John Chang, and fellow "advantage gambler" Manilo Lopez received a trespass warning

24   at the Hyakumi Restaurant in Caesar's Palace.  (See Caesar's Palace Security Report dated

25   February 12, 2006 attached hereto as Exh. "B")  Plaintiff acknowledges that she was read the

26   NRS 207.200 trespass law as they were escorted from property.  (Id. and Exh. "A" at pg. 75)

27   Plaintiff understood the gravity of the trespass warning, and that if she returned to the property

28   she "could be in trouble." (Exh. "A" at pg. 78)  On this date, Plaintiff was trespassed under the

M&A:05166-307 746759_1.DOC 2/24/2009 9:37 AM

MARQUIS & AURBACH
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

1 name of "Laurie Tsao." (Exh. "B")

### 2. Plaintiff's January 23, 2007 Trespass at the Rio

On January 23, 2007, Plaintiff was trespassed at the Rio Hotel and Casino – another casino owned and operated by Desert Palace, Inc. (Exh. "A" at pg. 77; see also Harrah's Entertainment, Inc. Rio Security Department Report dated January 23, 2007 attached hereto as Exh. "C") Plaintiff knew that the Rio Hotel and Casino was a Harrah's property. (Exh. "A" at pgs. 77-78) On that date, Rio security identified Plaintiff as "Laurie Tsao" and "confirmed [her] to be a prior trespass from Caesar's Palace." (Id.) Plaintiff was read the trespass warning and walked off the property. (Exh. "A" at pg. 78; see also Exh. "C")

### 3. Plaintiff's September 23, 2007 Trespass at Caesar's Palace

Despite her prior trespasses, Plaintiff returned to Caesar's Palace on September 23, 2007. (Exh. "A" at pgs. 79-80) Aware that "Laurie Tsao" was trespassed from Caesar's Palace, Plaintiff chose to gamble under the name of her friend "Shuyu Deng." (Id.) While playing blackjack, Caesar's Palace security decided to trespass Plaintiff from its property. Caesar's Palace security officer Clint Makeley approached Plaintiff and requested identification. (See Caesar's Palace security report dated September 23, 2007 attached hereto as Exh. "D"; see also Deposition of Clint Makeley attached hereto as Exh. "E" at pg. 49) Plaintiff did not have any identification and provided Mr. Makeley with a player's card bearing the name "Shuyu Deng." (Exh. "D"; see also Exh. "A" at pg. 80) Because Caesar's Palace did not recognize her as the "Laurie Tsao" trespassed on February 12, 2006, they simply read "Shuyu Deng" the trespass statute and escorted her off the property. (Exh. "A" at pg. 80; Exh. "D") Mr. Makeley told Plaintiff she could not return to any of Harrah's properties. (Exh. "A" at pg. 82) According to Plaintiff, after receiving the trespass warning under the name "Shuyu Deng" she knew that if she returned to Caesar's Palace (or any Harrah's Entertainment property) "[she] could be in trouble." (Exh. "A" at pg. 81)

### C. THE MARCH 19, 2008 INCIDENT GIVING RISE TO THIS LITIGATION

### 1. Plaintiff Returns to Caesar's Palace

On March 19, 2008, Plaintiff again returned to Caesar's Palace to gamble. Plaintiff's

M&A:05166-307 746759_1.DOC 2/24/2009 9:37 AM

MARQUIS & AURBACH
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

night began on March 18, 2008, when Plaintiff and her friend, Nelson Fu, began a late night of gambling at the Monte Carlo Hotel and Casino. (Exh. "A" at pg. 88) While at the Monte Carlo, the pair began to receive "attention" and the casino requested that Mr. Fu show identification. (Id. at pgs. 89-90) To avoid the "attention," Plaintiff and Mr. Fu left the Monte Carlo. (Id.)

Around 2:00 a.m. on March 19, 2008, Mr. Fu and Plaintiff drove Plaintiff's 2008 Camry to Caesar's. (Id. at pgs. 90-93; 153) (It is important to note that Mr. Fu did not have a set of keys to Plaintiff's car. (Id. at pgs. 153-54; see also Deposition Transcript of Nelson Fu attached hereto as Exh. "F" at pg. 54)) Upon arrival, Plaintiff purposefully left her driver's license in her vehicle so that she would not have any identification on her person. (Exh. "A" at pgs. 163-164) In addition, Plaintiff wore a large floppy hat to conceal her identity from Caesar's Palace security. (Id. at pg. 149) Once inside Caesar's Palace, Plaintiff began gambling using a player's card issued to a "Monica Lieu." (Id. at pg. 157) According to Plaintiff, she has "no idea" who Ms. Lieu is, and it "[was] just a card I picked up on the table, . . . [a]nd I'm recognized as a female, so why can't I be Monica?" (Id. at pg. 56)

## 2. Plaintiff Reunites with Clint Makeley

Initially, Plaintiff did not receive any negative attention at Caesar's Palace. (Exh. "A" at pg. 94) However, at some point, Caesar's Palace graveyard security supervisor, Clint Makeley, was notified by surveillance "that previously trespassed [Shuyu] Deng is on property." (Exh. "E" at pgs. 4 and 17-18) Mr. Makeley recognized that Plaintiff "was a previously trespassed individual that I previously trespassed from [Caesar's Palace]. . ." (Id. at pg. 18; see also Exh. "D")

Mr. Makeley approached Plaintiff and asked for identification and Plaintiff said she did not have any. (Exh. "A" at pg. 95) Plaintiff told Mr. Makeley she would voluntarily leave the premises. (Id.) Mr. Makeley told Plaintiff because she was a previous trespass, she either needed to show picture identification or be arrested. (Id.) According to Mr. Makeley, because he had personal knowledge of Plaintiff's prior trespass a mere six (6) months earlier, he could either arrest Plaintiff for trespass or issue a summons in lieu of arrest through the "Summons in Lieu of Arrest" program (hereinafter "SILA").

M&A:05166-307 746759_1.DOC 2/24/2009 9:37 AM

MARQUIS & AURBACH
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

1   SILA is an LVMPD-sponsored program that allows casinos, department stores, and other

2   similar institutions' security personnel to issue misdemeanor citations to alleviate "some of the

3   manpower concerns of the police." (See Deposition of Travis Crumrine attached hereto as Exh.

4   "G" at pg. 97) Mr. Makeley is trained in the SILA program and is certified to participate and

5   issue misdemeanor citations. (Exh. "E" at pg. 42) In order to perform a SILA, four requirements

6   must be met. The suspect citizen must: (1) have positive identification; (2) not be under the

7   influence of drugs or alcohol; (3) have no active warrants; and (4) be cooperative. (Id. at pgs.

8   39-40) Here, Plaintiff met all the requirements except positive identification. Mr. Makeley

9   testified that if Plaintiff had possessed positive identification he would have issued a SILA and

10  let her go. (Id. at pgs. 19, 44)

11  Because Mr. Makeley only knew Plaintiff as "Shuyu Deng," and because she did not

12  have positive identification, Caesar's Palace notified LVMPD dispatch it had an unidentified

13  female in custody. Mr. Makeley then placed Plaintiff under arrest for trespassing, handcuffed

14  Plaintiff, and escorted her to the Caesar's Palace security room. (Exh. "A" at pg. 97; see also

15  Caesar's Palace security report dated March 19, 2008 attached hereto as Exh. "H")

16  After Mr. Makeley detained Plaintiff she had no further contact with Mr. Fu. In fact,

17  Plaintiff lied to Mr. Makeley and denied even knowing Mr. Fu (Exh. "A" at pgs. 112-13) Most

18  important, Plaintiff admits she never gave Mr. Fu her car keys or even asked him to move her car

19  off the Caesar's Palace premises. (Id. at pg. 102; see also Exh. "F" at pgs. 54-55)

### 3.   The Arrival of Officer Travis Crumrine

21  On the morning of March 19, 2008, LVMPD police officer Travis Crumrine was working

22  the Las Vegas Strip area as a patrol officer. Dispatch informed him that Caesar's Palace had a

23  female in custody for trespass. (Exh. "G" at pg. 21) It is Ofc. Crumrine's experience that when

24  a casino requests assistance on a trespass call "the most common reason [is] that the person can't

25  [positively] be identified, so they can't be cited until they are." (Id. at pg. 98) Thus, Ofc.

26  Crumrine traveled to Caesar's Palace to investigate.

27  Ofc. Crumrine encountered Mr. Makeley upon arrival. Mr. Makeley told Ofc. Crumrine

28  that Caesar's Palace had a female in custody with prior trespasses. However, Mr. Makeley told

M&A:05166-307 746759_1.DOC 2/24/2009 9:37 AM

MARQUIS & AURBACH
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

1   Ofc. Crumrine that Plaintiff had used so many aliases that Caesar's Palace did not know her true

2   identity. (Id. at pg. 24) After talking to Mr. Makeley, Ofc. Crumrine entered the security room

3   with his only intent being to positively identify Plaintiff so Caesar's Palace could formally

4   trespass her.

5       All of Ofc. Crumrine's interaction with Plaintiff is captured on Caesar's Palace

6   surveillance video. (See DVD of March 19, 2008 Caesar's Palace detention of Plaintiff attached

7   hereto as Exh. "I")[3] Upon entering the security room, Mr. Makeley told Ofc. Crumrine that

8   Plaintiff has "no i.d." and that she was a prior trespass in "September 2007." (Exh. "I" at

9   5:51:50) Mr. Makeley told Ofc. Crumrine that Plaintiff gave the name of "Laurie Chen" and she

10  was playing with another individual's players' card. (Id. at 5:52:08) Ofc. Crumrine, while

11  performing a search incident to an arrest, found several player's cards in Plaintiff's purse in

12  various names. Plaintiff told Ofc. Crumrine the cards belong to various family members. (Id. at

13  5:55:49)

14      Eventually, Ofc. Crumrine questioned Plaintiff regarding her identity. Plaintiff reiterated

15  she had no identification but admitted to driving herself to Caesar's Palace. (Id. at 5:56:16 –

16  5:56:24) After receiving this response, Ofc. Crumrine asked Plaintiff the current location of her

17  vehicle. Plaintiff lied to Ofc. Crumrine by claiming that her car was being driven by "a friend."

18  (Id. 5:56:33) Ofc. Crumrine then directly asked Plaintiff, "[a]re you lying?" Plaintiff responded,

19  "maybe." (Id. 5:56:48) When asked her name, Plaintiff said her name was "Laurie Cao Chang"

20  – specifically spelling her claimed middle name "C-A-O." (Id. 5:57:02) Plaintiff never spelled

21  "Tsao." Plaintiff then gave her correct birth date and correct social security number. (Id.

22  5:57:24)

23      Because Plaintiff admitted to driving, Ofc. Crumrine asked Plaintiff whether she had a

24  driver's license. Plaintiff purposefully avoided the question by answering that she has a "U.S.

25  Passport." (Id. at 5:57:41) When Ofc. Crumrine reminded Plaintiff that it is illegal to drive a

26  vehicle without a driver's license, Plaintiff finally acquiesced and admitted she had a Nevada

27  _____

28  [3] The United States Supreme Court recently held that videotape evidence can be relied upon – even when
it contradicts a non-moving party's recollection. Scott v. Harris, 550 U.S. 372, 127 S. Ct. 1769 (2007).

driver's license. (Id. 5:57:52)

After receiving this information, Ofc. Crumrine went to his police vehicle to run Plaintiff's information. At his vehicle, Ofc. Crumrine ran the name "Laurie Chang" with the date of birth and social security number provided by Plaintiff. Because the name did not match either the social security number or birth date, Ofc. Crumrine's search came back negative. (Exh. "G" at p. 48) At this point, Ofc. Crumrine took Plaintiff's car keys and instructed Caesar's Palace security to locate Plaintiff's car by pushing the unlock button. He instructed them to only write down the plate number once the car was located. (Id. at 48) Eventually, Caesar's Palace security located the car and returned to Ofc. Crumrine with the plate number. After running the plate, Ofc. Crumrine learned for the first time that Plaintiff's driver's license was under the name of "Laurie Tsao." (Id. at pg. 48) *At no time during the entire incident did Plaintiff ever tell Ofc. Crumrine that her name was "Laurie Tsao."* (Id. at pgs. 99-100)

### 4.    Plaintiff's Alleged Attorney Arrives on Scene

While Caesar's Palace detained Plaintiff, Mr. Fu left the scene and called Plaintiff's husband, John Chang. (Exh. "F" at pg. 43) He informed John that Plaintiff was in custody and the police were called. (Id.) According to Mr. Fu, John said he would call an attorney and "try to get [Plaintiff] out." (Id. at pg. 45) Indeed, an individual did arrive on scene claiming to be an attorney. (Exh. "E" at pg. 67; see also Exh. "G" at pg. 89)

The Caesar's Palace security booth notified Mr. Makeley that an individual claiming to be a "lawyer or somebody representing [Plaintiff]" was present. (Exh. "E" at pg. 67) Mr. Makeley chose not to visit with the person but did pass the information on to Ofc. Crumrine. (Id.) Ofc. Crumrine thought "what the heck?" and left to talk with the person claiming to be an attorney. (Id. at pg. 89) Allegedly, the individual was a Bob Nersesian.

Ofc. Crumrine met Mr. Nersesian at the security booth. Interestingly, Mr. Nersesian initially identified his client as "Laurie *Tsao*" and not "Laurie Chang." (Id. at pgs. 93 and 95) As such, Ofc. Crumrine told Mr. Nersesian there "must be a misunderstanding because [Laurie Tsao is] not the person I have in the back room." (Id.) Luckily for Ofc. Crumrine, Mr. Nersesian took the time to "explain[] to Crumrine the distinction between the names 'Laurie

M&A:05166-307 746759_1.DOC 2/24/2009 9:37 AM

MARQUIS & AURBACH
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

Tsao' and 'Laurie Chang,' going as far as to identify the former as a maiden name historically used by plaintiff and the latter as a married name of the plaintiff. . . ." (Compl. ¶ 17) Plaintiff's attorney also explained that "Plaintiff is at a point where she is *transitioning* between her maiden name (Laurie Tsao) and her married name (Laurie Chang)." (Id. at ¶ 15 (emphasis added)) Unfortunately, Ofc. Crumrine was not told how long this "transition" would take.

Mr. Nersesian next presented Ofc. Crumrine with unauthenticated random pieces of papers that Mr. Nersesian represented were "reinvitations" for Plaintiff to return to Caesar's Palace. (Compl. ¶ 18; Exh. "G" at pg. 93) Ofc. Crumrine told him that his argument was "pretty weak." (Exh. "G" at pg. 95) Finally, Mr. Nersesian asked Ofc. Crumrine if Plaintiff could just be cited and released. Ofc. Crumrine informed Mr. Nersesian that Plaintiff obstructed an investigation and was being arrested accordingly. (Id.)

### 5. Plaintiff's Arrest

As a result of the above, Plaintiff was arrested on two separate charges. First, Mr. Makeley performed a citizen's arrest on behalf of Caesar's Palace for trespassing. (See Statement of Nevada Misdemeanor Citation dated March 19, 2008, attached hereto as Exh. "J") Specifically, the citation read:

> [Plaintiff] did return and remain on property after warning not to trespass by a representative of the owner, to wit by Clinton Makeley on 9/23/07.

Id. This citation was signed by Mr. Makeley and his signature was witnessed by Ofc. Crumrine. (Id.; Exh. "G" at pg. 96)

In addition, Ofc. Crumrine placed Plaintiff under arrest for "Providing False Information to a Police Officer" in violation of NRS 197.190. (See LVMPD Temporary Custody Record dated March 19, 2008, signed by Travis Crumrine attached hereto as Exh. "K") Ofc. Crumrine arrested Plaintiff based upon the fact that he believed Plaintiff was "willfully and unlawfully hindering, obstructing or delaying" his investigation. (Exh. "G" at pg. 68) Specifically, Ofc. Crumrine believed that Plaintiff obstructed and delayed his investigation by not identifying herself with a legal name that he could readily access through a government database. (Id.) In

MARQUIS & AURBACH
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

1    addition, Plaintiff attempted to delay the investigation by lying about the whereabouts of her

2    vehicle.

3        As a precautionary measure, Ofc. Crumrine requested that his sergeant, Regina Floyd,

4    arrive on scene and evaluate his decision. According to Ofc. Crumrine, Sgt. Floyd agreed with

5    his decision to arrest Plaintiff. (Id. at pg. 85) Plaintiff was arrested and taken to Clark County

6    Detention Center. According to Plaintiff, all charges against her were eventually dismissed.

7    (Exh. "A" at pg. 123)

8    **III.**    **LEGAL ARGUMENT**

9        As a result of the above facts, Plaintiff is now suing Ofc. Travis Crumrine for

10    compensatory and punitive damages. (See Compl. at pgs. 13-14) Plaintiff is making both federal

11    claims pursuant to 42 U.S.C. §1983 and state law tort claims. The following legal argument is

12    organized as follows: (1) summary judgment standard; (2) Plaintiff's 42 U.S.C. §1983 claims

13    against Ofc. Crumrine and his defense of qualified immunity; (3) Plaintiff's state law tort claims;

14    and (4) Plaintiff's punitive damages claims.

15        **A.**    **SUMMARY JUDGMENT STANDARDS**

16        Fed. R. Civ. P. 56 allows this Court to enter summary judgment when there is no genuine

17    issue of material fact to be resolved, and the moving party is entitled to judgment as a matter of

18    law. Under a standard set by a trilogy of 1986 cases, the U.S. Supreme Court found that there is

19    no longer an issue for trial (i.e., genuine issue of material fact) if there is insufficient evidence to

20    sustain a judgment for the non-moving party. See Matsushita Electric Industrial Co. v. Zenith

21    Radio Corp., 475 U.S. 574 (1986); Celotex Corp. v. Catrett, 477 U.S. 317 (1986); and Anderson

22    v. Liberty Lobby, Inc., 477 U.S. 242 (1986).

23        The party moving for summary judgment has the initial burden of showing the absence of

24    a genuine issue of material fact. Adickes v. S.H. Kress & Co., 398 U.S. 144 (1970). Once the

25    movant's burden is met by presenting evidence which, if uncontroverted, would entitle the

26    movant to a directed verdict at trial, the burden shifts to the respondent to set forth specific facts

27    demonstrating that there is a genuine issue for trial. Anderson at 250. The court in Anderson

28    also held that if the evidence presented in the opposing affidavits is of insufficient caliber or

M&A:05166-307 746759_1.DOC 2/24/2009 9:37 AM

quantity, then no genuine issue of material fact is raised. Id. at 254. Further, if the factual context makes the respondent's claim implausible, then the party must come forward with more persuasive evidence than would otherwise be necessary to show there is a genuine issue for trial. Celotex at 317. The parties seeking to defeat summary judgment cannot stand on their pleadings once the movant has submitted affidavits or other similar materials. Affidavits that do not affirmatively demonstrate personal knowledge are insufficient. British Airways Bd. v. Boeing, Co., 585 F.2d 946, 952 (9th Cir. 1978).

Finally, the opposing party's burden is not excused by the fact that evidence to oppose the motion is in possession of the moving party as long as there has been a full opportunity to conduct discovery. Anderson, 477 U.S. at 249. It is insufficient for the non-moving party to simply show a mere metaphysical doubt as to the material facts. Matsushita Elec., 475 U.S. at 574. There must be evidence on which the jury could reasonably find for the party opposing judgment. Anderson, 477 U.S. at 247.

## B.   PLAINTIFF'S 42 U.S.C. §1983 CLAIMS AGAINST OFC. CRUMRINE FAIL

Plaintiff is alleging several constitutional violations under § 1983. She alleges that Ofc. Crumrine: (1) violated her Fourth Amendment rights by falsely arresting her without probable cause (Compl. ¶¶ 72, 74, and 78); (2) violated her Fifth Amendment right (via the Fourteenth Amendment) by violating Plaintiff's Miranda rights (id. ¶ 72); (3) violated her due process rights by failing to properly investigate the situation (Compl. ¶74); (4) violated her equal protection rights by engaging in selective prosecution (Compl. ¶¶ 69-70); and (5) engaged in a civil conspiracy with Caesar's Palace (id. ¶ 76). The following addresses § 1983 standards and qualified immunity and then each individual claim.

### 1.   Background:  42 U.S.C. §1983 Standards and Qualified Immunity

Plaintiff's federal claims under 42 U.S.C. §1983 involve individual capacity claims against Ofc. Crumrine. Section 1983 is not itself a source of substantive rights, but merely the procedural vehicle by which to vindicate federal rights elsewhere conferred. See Albright v. Oliver, 510 U.S. 266, 271 (1994). To make out a prima facie case under §1983, a plaintiff must

M&A:05166-307 746759_1.DOC 2/24/2009 9:37 AM

show that the defendant: (1) acted under color of law, and (2) deprived the plaintiff of a constitutional right. See Borunda v. Richmond, 885 F.2d 1384, 1391 (9th Cir. 1989). Ofc. Crumrine does not dispute that he acted under color of law. Therefore, the first task of the Court is to determine whether Plaintiff's constitutional rights were violated. See Albright, 510 U.S. at 271. If no constitutional rights were violated, all of Plaintiff's claims fail.

If a constitutional violation did occur, Ofc. Crumrine may then raise the affirmative defense of qualified immunity, which protects him in the course of performing the discretionary duties of his office. See Butler v. Elle, 281 F.3d 1014 (9th Cir. 2002). In the past, the Court was required to determine whether a constitutional violation occurred at the hands of governmental officials when initially analyzing a claim of qualified immunity. See Saucier v. Katz, 533 U.S. 194, 203 (2001). If a constitutional violation did occur, the Court was then required to determine whether qualified immunity applies by examining: (1) whether the violated right was clearly established; and (2) whether a reasonable public official would have believed that the particular conduct at issue was lawful. See Butler, 281 F.3d at 1021 (citations omitted). If neither the right was clearly established nor a reasonably officer would have believed the particular conduct was unlawful, the defendant is then entitled to summary judgment because the doctrine of qualified immunity is immunity from suit rather than a mere defense to liability. The immunity is from suit and not simply immunity from damages because "it is effectively lost if a case is erroneously permitted to go to trial." Saucier, 533 U.S. at 201. Thus, an officer who does not violate clearly established law is entitled to prevail at the earliest stage possible in the litigation. See Mitchell v. Forsyth, 472 U.S. 511, 528 (1985). Indeed, the Supreme Court stated in Malley v. Briggs, 475 U.S. 335, 344-45 (1986), that qualified immunity was designed to protect *all but the plainly incompetent or those who knowingly violate the law."* Id. at 341 (emphasis added). Simply put, qualified immunity is "an entitlement not to stand trial or face the other burdens of litigation." Mitchell, 472 U.S. at 526.

Recently, the Supreme Court addressed the applicability of the Saucier two-step analysis and decided that district courts have discretion to determine the order in which the two-step analysis is to be evaluated:

M&A:05166-307 746759_1.DOC 2/24/2009 9:37 AM

> [T]he district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances and in the particular case at hand.

Pearson v. Callahan, ___ U.S. ___, 129 S. Ct. 808 (2009).

Thus, it is the Court's prerogative whether to evaluate the case on the constitutional merits or immediately jump to qualified immunity. In this case, Ofc. Crumrine respectfully requests that the Court first address whether Plaintiff's constitutional rights were violated. The undisputed facts clearly show that both Plaintiff's arrests were based upon probable cause and no constitutional violations occurred. Nonetheless, if the Court disagrees, the evidence at a minimum shows that Ofc. Crumrine's actions were reasonable and that he is protected by the doctrine of qualified immunity.

### 2. Ofc. Crumrine Did Not Falsely Arrest Plaintiff

The gravamen of Plaintiff's Complaint is that Ofc. Crumrine violated Plaintiff's Fourth Amendment rights by falsely arresting her without probable cause. Plaintiff received both a citizen's arrest from Caesar's Palace and Ofc. Crumrine arrested Plaintiff for obstruction. The undisputed evidence shows that probable cause existed for both arrests.

#### a. Probable Cause Standard

Before addressing either arrest, it is important to establish the standard for probable cause. The Fourth Amendment does not indicate that no arrest will ever be made of individuals who are not ultimately prosecuted for the crimes for which they were arrested. Rather, it simply mandates that arrests may not be made without probable cause. "The constitution does not guarantee that only the guilty will be arrested." Baker v. McCollan, 443 U.S. 137, 144 (1979). Any arrest is privileged if made pursuant to probable cause. The analysis is the same whether under federal law or Nevada state law. See Marschall v. City of Carson, 86 Nev. 107, 110, 464 P.2d 494 (1970).

The law is clear that a police officer is not liable for a false arrest or false imprisonment so long as the facts and circumstances known to the officer or arresting person at the moment of the arrest would warrant a prudent person's belief that a crime had been committed by the person

M&A:05166-307 746759_1.DOC 2/24/2009 9:37 AM

MARQUIS & AURBACH
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

arrested. See Gordon v. State, 67 Nev. 177, 426 P.2d 425 (1967). In Nevada, a finding of probable cause may be based on only "slight evidence." See Sheriff, Clark County v. Badillo, 95 Nev. 593, 594, 600 P.2d 222 (1979) (finding probable cause despite conflicting witness testimony when one of the witnesses identified the respondent as one of the perpetrators). When an arrest is made with probable cause, the arresting individual is granted immunity. Hutchinson v. Grant, 796 F.2d 288, 290 (9th Cir. 1986).

The requirement of the presence of probable cause is not one of absolute certainty but rather one of a "fair probability" that the arrested person has committed the crime for which she is charged. United States v. Potter, 895 F.2d 1231, 1233-34 (9th Cir. 1990), cert. denied, 497 U.S. 1008 (1990). As set forth below, probable cause existed for both arrests.

### b. The Citizen's Arrest for Trespassing

Caesar's Palace performed a citizen's arrest of Plaintiff for trespass. (Exh. "J") Mr. Makeley specifically testified that he performed the citizen's arrest. (Exh. "E" at pg. 74) Nevada Revised Statute 171.124 states that a police officer may not arrest a person charged with a misdemeanor unless it is committed in the officer's presence. However, if an individual has committed a misdemeanor in the presence of another citizen, that citizen may effectuate a citizen's arrest. See NRS 171.126. The Nevada statutes do not describe the procedure for a citizen's arrest.

The authority to perform a citizen's arrest is exclusively within the police powers of the state. Accordingly, this activity is not subject to Fourth or Fourteenth Amendment constitutional limitations. Burdeau v. McDowell, 256 U.S. 465 (1921). Courts have held that a citizen's arrest is appropriate. In fact, even when an officer makes an arrest outside of his jurisdiction, if probable cause is present, the arrest does not violate the Fourth Amendment because the officers' actions are authorized as a citizen's arrest. United States v. Layne, 6 F.3d 386, 389-99 (6th Cir. 1993). Such actions by private citizens do not rise to the level of constitutional violations. See Carey v. Continental Airlines, Inc., 823 F.2d 1402, 1404 (10th Cir. 1987). Indeed, when a private citizen utilizes the endowed right to effectuate an arrest, the citizen has been specifically held not to be a state actor and, therefore, cannot be said to act under the color of state law. See State v.

M&A:05166-307 746759_1.DOC 2/24/2009 9:37 AM

MARQUIS & AURBACH
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

MARQUIS & AURBACH
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

Buswell, 460 N.W.2d 614, 620 (Minn. 1990), cert. denied, 499 U.S. 906 (1991); United States v. Lima, 424 A.2d 113, 118-19 (D.C. Ct. App. 1980). There have been citizen's arrests for as long as there have been public police - - in fact, much longer. Arrests have never been an exclusive governmental function. Spencer v. Lee, 864 F.2d 1376, 1380 (7th Cir. 1989), cert. denied, 494 U.S. 1016 (1990).

Here the arrest for trespassing was made by a private citizen -- not by Ofc. Crumrine. Ofc. Crumrine simply witnessed Mr. Makeley's signature and enforced the law. Nonetheless, the evidence known to Ofc. Crumrine at the time of the arrest supported Mr. Makeley's actions. The standard for judging Ofc. Crumrine's actions is determined by what Ofc. Crumrine knew at the time of the arrest. Any facts learned by Ofc. Crumrine post-arrest are irrelevant. See Gooden v. Howard County, Maryland, 954 F.2d 960, 964-965 (4th Cir. 1992) (en banc). With respect to the trespass claim, Ofc. Crumrine knew the following information:

- Caesar's Palace told Ofc. Crumrine that Plaintiff had been trespassed from the property several times and showed him paperwork and surveillance pictures in support. (Exh. "G" at pg. 24)

- Plaintiff admits that she had been trespassed from Harrah's Entertainment Properties on at least three prior occasions and Caesar's itself on two other occasions. (Exh. "A" at pgs. 71, 75, and 79-81)

- In addition, Caesar's Palace's graveyard security supervisor, Mr. Makeley, represented that he had personally trespassed Plaintiff six months earlier in September 2007. (Exh. "E" at pg. 49)

Thus, at the time Ofc. Crumrine witnessed the misdemeanor trespass citation, he was told that Plaintiff had illegally returned to Caesar's Palace property after being trespassed on several other occasions. In addition, Ofc. Crumrine was shown documentary evidence supporting this allegation. As such, Ofc. Crumrine felt probable cause existed to allow the citizen's arrest. Ofc. Crumrine simply witnessed Mr. Makeley's signature on the trespass citation. (Exh. "J")

Plaintiff's position is that Ofc. Crumrine acted unconstitutionally because he did not accept as true the legal arguments of the unknown person (Mr. Nersesian) in the hallway claiming to be Plaintiff's attorney. (Compl. ¶ 72) Under Plaintiff's novel theory, the Constitution requires Ofc. Crumrine to accept all statements as true by individuals who claim to

M&A:05166-307 746759_1.DOC 2/24/2009 9:37 AM

1  be attorneys who unilaterally interject themselves into official police business. Unsurprisingly,

2  there is no legal support for Plaintiff's assertion. Furthermore, it is very important to keep in

3  mind that Plaintiff never made any of these arguments on her own behalf -- they were only made

4  by some stranger in a hallway at 5:50 a.m. claiming to be an attorney. (See Exh. "I")

5  　　　　Plaintiff also seems to believe the Constitution mandates that Ofc. Crumrine conduct a

6  mini-trial and act as judge and jury and rule upon affirmative defenses before making an arrest.

7  (Compl. ¶ 18) This is not an accurate understanding of the law. Ofc. Crumrine needs only to

8  determine whether probable cause (i.e., "slight evidence") exists that a crime was committed.

9  See Badillo, 95 Nev. at 594. Ofc. Crumrine is not required to make legal determination on the

10  applicability of various legal privileges or affirmative defenses. Such determinations are made

11  by the district attorney and eventually the criminal case finder of fact. Based upon the

12  undisputed facts, it is clear that the requisite probable cause existed for the citizen's arrest. Ofc.

13  Crumrine conducted a thorough investigation by interviewing all known witnesses and reviewing

14  all provided documentary evidence (including those held by Plaintiff's attorney). He then

15  concluded that probable cause existed that Plaintiff was trespassing, and he witnessed the

16  citation.

17  　　　　At the very least, Ofc. Crumrine is entitled to qualified immunity. Plaintiff will

18  undoubtedly argue that the alleged invitations from Caesar's Palace revoked the trespass.

19  However, Plaintiff cannot provide this Court with any "clearly established law" that a mass

20  mailing revokes three prior trespasses. As such, even if this allegation is true, Ofc. Crumrine

21  does not have any clearly established law informing him that a mass mailing revokes a trespass,

22  and his decision to arrest Plaintiff was reasonable. Also, there is no clearly established law that

23  Ofc. Crumrine must evaluate and rule upon potential affirmative defenses and privileges raised

24  by a bystander in a hallway.

25  　　　　　　　　c.　　**Probable Cause Existed to Arrest Plaintiff for Obstruction**

26  　　　　The next issue is whether Ofc. Crumrine possessed the requisite probable cause to

27  personally arrest Plaintiff for obstruction of a police officer. As stated above, under Nevada law,

28  a police officer may arrest a person charged with a misdemeanor when it is committed in the

M&A:05166-307 746759_1.DOC 2/24/2009 9:37 AM

MARQUIS & AURBACH
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

police officer's presence.  See NRS 171.124.  Here, Ofc. Crumrine arrested Plaintiff for obstructing a police officer.  The relevant statute reads as follows:

> **NRS 197.190 "Obstructing a Police Officer"** Every person who, after due notice, shall refuse or neglect to make or furnish any statement, report or information lawfully required of him by any public officer, or who, in such statement, report or information shall make any willfully untrue, misleading or exaggerated statement, or who shall willfully hinder, delay or obstruct any public officer in the discharge of his official powers or duties, shall, where no other provision of law applies, be guilty of a misdemeanor.

Id.

Nevada Revised Statute 171.123 allows police officers to detain individuals suspected of criminal behavior and to "ascertain his identity."  See NRS 171.123(3).  In addition, the statute mandates the detained individual "shall identify himself. . ."  Id.  In 2004, the United States Supreme Court reviewed NRS 171.123, Nevada's "stop and identify" statute and found it to pass constitutional muster.  See Hiibel v. Sixth Jud. Dist. Court of Nevada, 542 U.S. 177 (2004).  The Court determined that Nevada's "stop and identify" statute struck a proper balance between the intrusion of the individual and legitimate governmental interest.  Hiibel, 542 U.S. at 178.

Therefore, the primary question is *whether probable cause existed that Plaintiff obstructed or delayed Ofc. Crumrine's investigation in violation of NRS 197.190 by not identifying herself as required by NRS 171.123.*  Plaintiff's legal name is "Laurie Tsao."  This is evidenced by the fact that this name (and only this name) is used by Plaintiff for the following purposes:

- Her driver's license;
- Her bank accounts;
- Her credit cards;
- Her Nevada Health Card obtained in 2006;
- Her social security card; and
- Her business dealings.

(See Exh. "A" at pgs. 20-30 and 144)  Furthermore, Plaintiff's attorney Mr. Nersesian (who

M&A:05166-307 746759_1.DOC 2/24/2009 9:37 AM

MARQUIS & AURBACH
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

expects all of his representation to be accepted as true (Compl. ¶ 16-18)) first identified Plaintiff to Ofc. Crumrine as "Laurie Tsao" on the night in question. (Exh. "G" at pg. 93) Finally, Plaintiff admits that she purposefully refused to provide the name "Laurie Tsao" to Ofc. Crumrine because "that was the most pertinent name." (Id. at pg. 160)

Plaintiff only gave Ofc. Crumrine the name of "Laurie Chang." (Exh. "A" at pg. 117; Exh. "I" at 5:57:02)) In addition, she spelled her maiden/middle name as "C-A-O" to ensure that Ofc. Crumrine did not use the name "Tsao." (Exh. "I" at 5:57:02) Plaintiff purposefully never informed Ofc. Crumrine that she was known or registered in the DMV as "Laurie Tsao." As such, Plaintiff delayed and obstructed the investigation regarding her identity in violation of NRS 197.190.

Plaintiff is now asserting that she has two legal names – "Laurie Tsao" and "Laurie Chang." (Compl. ¶ 17) However, "Laurie Chang" is not Plaintiff's legal name. Plaintiff knows this fact. In Nevada, an individual must petition the court to legally change her name. See NRS 41.270. In addition the person must publish notice of the name change. See NRS 41.280. Plaintiff admits that she has never petitioned to have her name legally changed to "Laurie Chang" as required by Nevada law. (Exh. "A" at pg. 142) Plaintiff claims that on March 19, 2008, she was "at a point where she is transitioning between [Laurie Tsao] and [Laurie Chang]." (Compl. ¶ 15) Apparently, Plaintiff began this transition on March 19, 2008. Plaintiff admits that in 2006 she obtained her Nevada Health Card under the name "Laurie Tsao." (Exh. "A" at pg. 24) The only "legal" document identifying Plaintiff as "Laurie Chang" is her U.S. passport. (Id. at pg. 25) However, this identification is suspect because Plaintiff openly admits that she conceals her identity by obtaining fraudulent passports under phony/illegal names. (Id. at pgs. 65, 142 and 198). Furthermore, Ofc. Crumrine had no ability to check the legality of Plaintiff's passport at 5:50 in the morning. (**Exh. "G"** at pg. 72)Therefore, it is impossible to tell whether Plaintiff's passport in the name of "Laurie Chang" is even legitimate.

The truth is that Plaintiff purposefully concealed her true identity from Ofc. Crumrine. Plaintiff never told Ofc. Crumrine the name "Tsao" during the entire investigation because she

M&A:05166-307 746759_1.DOC 2/24/2009 9:37 AM

MARQUIS & AURBACH
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

MARQUIS & AURBACH
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

knew that "it was the most pertinent name." (Exh. "A" at pg. 160) Plaintiff admits she does everything in her power to conceal her true identity – including obtaining fraudulent passports, using fake names, and converting strangers' players' cards for her benefit. Plaintiff knew the name "Laurie Chang" would not show up in Nevada's DMV database or any other government database. It is simply disingenuous for Plaintiff to argue that she did not attempt to delay or obstruct Ofc. Crumrine's investigation. Only after Ofc. Crumrine located Plaintiff's vehicle and ran her license plate number did he learn her most "pertinent name" and positively identify her. Plaintiff *never* used the name "Laurie Tsao" or informed Ofc. Crumrine that she was currently undergoing a "transitioning" between names. A reasonable person who was undergoing the rigors of "transition" from one identity to another would inform a peace officer of such. Thus, the evidence clearly shows that Plaintiff in an attempt to delay or hinder Ofc. Crumrine's investigation never identified herself as required by NRS 171.123.

Further support of Plaintiff's obstruction is demonstrated by her false statements regarding her vehicle. In an attempt to ascertain whether Plaintiff had a valid driver's license Ofc. Crumrine asked Plaintiff how she arrived at Caesar's Palace and the location of her car. Plaintiff told Ofc. Crumrine that, although she drove herself to Caesar's Palace, her car was being driven by "a friend." (Exh. "I" at 5:56:33; Exh. "A" at pg. 116) Plaintiff knew that her car was located in the Caesar's Palace parking garage. (Exh. "F" at pg. 54-55 and Exh. "A" at 167-69) When Ofc. Crumrine asked Plaintiff point blank whether she was lying, Plaintiff smugly responded, "maybe." (Exh. "A" at pg. 116; 169; Exh. "I" at 5:56:48) By using the word "maybe" Plaintiff essentially admitted she was, at a minimum, misleading Ofc. Crumrine and obstructing and delaying his investigation. This deception is further evidenced by the fact that Plaintiff attempted to conceal the fact she had a driver's license. When asked a direct question, Plaintiff attempted to be cute by responding that she had a "U.S. Passport." (Exh. "A" at 5:57:41)

NRS 197.190 makes it a misdemeanor to "willfully hinder, delay or obstruct" a police officer. It is beyond dispute, that at a minimum, Plaintiff attempted to obstruct and hinder Ofc. Crumrine's investigation. Plaintiff admits that under no circumstances does she want to be

M&A:05166-307 746759_1.DOC 2/24/2009 9:37 AM

MARQUIS & AURBACH
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

1   identified by her legal name "Laurie Tsao" and she goes to great lengths to hide that name.

2   Furthermore, she lied about the whereabouts of her car. Based upon Plaintiff's admitted actions,

3   it is indisputable that a reasonable officer could conclude that a "fair probability" existed that

4   Plaintiff was obstructing and/or delaying an investigation. At a minimum, Ofc. Crumrine is

5   protected by qualified immunity as he acted reasonably.

6       (On a final note, it is worthy to note that just four months after this incident, Plaintiff was

7   arrested at the Bellagio for trespassing. On that date, Plaintiff gave the name "Laurie Tsao" and

8   did not use the name "Laurie Chang." Again, further evidence that Plaintiff's legal name is

9   "Laurie Tsao." (Exh. "A" at pg. 179))

10              **3.   Plaintiff's Alleged _Miranda_ Violation Fails**

11      Plaintiff's Complaint also alleges that Ofc. Crumrine violated her Fifth Amendment self-

12  incrimination rights by "subject[ing] Plaintiff to a custodial interrogation without _Miranda_

13  warnings in violation of clearly established law." (Compl. ¶ 22)

14      The Fifth Amendment, made applicable to the states by the Fourteenth Amendment,

15  requires that "[n]o person . .. shall be compelled _in any criminal case_ to be a _witness_ against

16  himself." U.S. Const., Amdt. 5 (emphasis added); see also Malloy v. Hogan, 378 U.S. 1 (1964).

17  In Chavez v. Martinez, 538 U.S. 760, 766 (2003), a plaintiff argued that the meaning of

18  "criminal case" encompassed the entire criminal investigatory process, including police

19  interrogations. The Court responded, "We disagree." Id. at 766. The Court refused to define

20  when a criminal case begins but stated "it is enough to say that police questioning does not

21  constitute a 'case' . . ." Id. at 767. The Court held that the Fifth Amendment is only invoked if

22  the statements are used during a criminal trial.

23      Here, Plaintiff was never prosecuted for a crime, let alone compelled to be a witness

24  against herself in a criminal case. Thus, no cause of action exists. In addition, Ofc. Crumrine

25  only sought information relevant to identifying Plaintiff. Ofc. Crumrine's questions became

26  necessary when Plaintiff purposefully refused to give up her most "pertinent name."

27              **4.   Failure to Investigate Claim**

28      Although not artfully pled, Plaintiff's Complaint implies a claim that Ofc. Crumrine

M&A:05166-307 746759_1.DOC 2/24/2009 9:37 AM

MARQUIS & AURBACH
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

failed to properly investigate this matter. (Compl. ¶74) If properly pled, this allegation would be framed as a due process violation under the Fourteenth Amendment. The Ninth Circuit has held that there is "no instance where the courts have recognized inadequate investigation as sufficient to state a civil rights claim unless there was another recognized constitutional right involved." Gomez v. Whitney, 757 F.2d 1005 (9th Cir. 1985). There is no constitutional right for a citizen to instruct a police officer on how to conduct an investigation. Plaintiff's allegation that Ofc. Crumrine had an obligation to investigate the affirmative defenses raised by the individual claiming to be her attorney confuses the function of a police officer with the function of a prosecutor and/or judge. This type of claim was implicitly rejected in Lee v. Town of Estes Park, 820 F.2d 1112, 1114-15 (10th Cir. 1987) (noting procedure whereby officer took custody of the suspect and determined charges based solely on an interview with the accuser who made the citizen's arrest).

Plaintiff has not identified a constitutional violation to which she can anchor this claim. Rather, it appears that this claim is part of Plaintiff's larger civil conspiracy claim addressed below. As such, summary judgment is appropriate.

### 5. Plaintiff's Selective Prosecution Claim

Again, although not specifically pled, Plaintiff's Complaint implies she is making a selective prosecution claim - - i.e., that Ofc. Crumrine provides "special protection" to casinos, thus infringing upon the constitutional rights of individuals. (Compl. ¶91, pgs. 69-70) This claim would also come under the Fourteenth Amendment Equal Protection clause.

Sometimes the enforcement of an otherwise valid law can be a means of violating constitutional rights by discrimination. To address this problem courts have developed the doctrine of selective enforcement. See Freeman v. City of Santa Ana, 68 F.3d 1180, 1187 (9th Cir. 1995); Futernick v. Sumpter Township, 78 F.3d 1051, 1057 (6th Cir.), cert. denied, 519 U.S. 928 (1996). Selective enforcement can also lead to § 1983 liability if the plaintiff pleads "purposeful discrimination." Wayte v. United States, 470 U.S. 598 (1985); see also Oyler v. Boles, 368 U.S. 448, 456 (1962). Discrimination is "purposeful" if it is intended to accomplish some forbidden aim such as intentional selective enforcement based on race, nationality,

religion, or gender. <u>Wayte</u>, 470 U.S. at 598.

In <u>Wayte</u>, the Court established a three-part test for determining if selective enforcement has occurred: (1) an official must single out a person belonging to an identifiable group, such as those of a particular race or religion, or a group exercising constitutional rights, for prosecution even though he has decided not to prosecute persons not belonging to that group in similar situations; (2) the official must initiate the prosecution with a discriminatory purpose; and (3) the prosecution must have a discriminatory effect on the group to which the plaintiff belongs. With regard to the first element, it is an "absolute requirement" that the plaintiff make at least a prima facie showing that similarly situated persons outside his category were not prosecuted. <u>See</u> <u>United States v. Armstrong</u>, 517 U.S. 456 (1996). Furthermore, there is a strong presumption that the state actors have properly discharged their official duties, and to overcome that presumption the plaintiff must present clear evidence to the contrary; "the standard is a demanding one." <u>Armstrong</u>, 517 U.S. at 456. Finally, a plaintiff, in a selective-prosecution case, must demonstrate that he was prosecuted simply because he was a member of some protected group, and not merely that a state actor prosecuted him out of purely personal animosity. <u>See</u> <u>Futernick</u>, 78 F.3d at 1057.

The Plaintiff fails to meet any of the <u>Wayte</u> requirements. Plaintiff alleges that she belongs to a protected class of "legal professional gamblers." (Compl. ¶69) "Advantage gamblers" certainly do not qualify as an "identifiable group" who receive special constitutional protections. As such, the Plaintiff has failed to even allege a prima facie selective enforcement claim and has generated no facts supporting this claim. In addition, the Plaintiff has failed to show that Ofc. Crumrine failed to take action against others similarly situated to the Plaintiff. Therefore, the Plaintiff's selective enforcement claim fails.

### 6. Civil Conspiracy

Plaintiff's final implied allegation under 42 U.S.C. §1983 is that Ofc. Crumrine and Caesar's Palace entered into a conspiracy to deprive Plaintiff of her constitutional rights. (Compl. ¶76-78) To establish a defendant's liability for a conspiracy, a plaintiff must demonstrate the existence of "an agreement or 'meeting of minds' to violate a constitutional

M&A:05166-307 746759_1.DOC 2/24/2009 9:37 AM

MARQUIS & AURBACH
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

right." United Steel Workers of America v. Phelps Dodge Corp., 865 F.2d 1539, 1540-41 (9th Cir. 1989) (en banc). The defendants must have, "by some concerted action, intend[ed] to accomplish some unlawful objective for the purpose of harming another which results in damage." Gilbrook v. City of West Minster, 177 F.3d 839, 856 (9th Cir. 1999) (citations omitted). "To be liable, each participant in the conspiracy need not know the exact details of the plan, but each participant must at least share the common objective of the conspiracy." Phelps Dodge, 865 F.2d at 1541. Finally, and importantly, the conspiratorial agreement itself does not state a cause of action. *An actual deprivation of rights is also necessary.* See Cefalu v. Village of Elk Grove, 211 F.3d 416 (7th Cir. 2000). (Where a jury exonerated defendants on false arrest and malicious prosecution claims, defendants were entitled to judgment on conspiracy claim.) Here, Plaintiff's alleged conspiracy claim fails for two reasons.

First, as set forth *supra*, Plaintiff has failed to prove she suffered an actual deprivation of rights. Plaintiff's primary allegation is that she was arrested without probable cause for trespass and obstruction. As set forth above, probable cause existed for both arrests. Second, Plaintiff has failed to generate any evidence of a "meeting of the minds" or of any agreement. According to Mr. Makeley, Ofc. Crumrine never told him [Mr. Makeley] what to write in his statements or to even arrest Plaintiff. In addition, Mr. Makeley admits he never told Ofc. Crumrine what to write in his reports. (Exh. "E" at pgs. 81-82) Plaintiff has absolutely no evidence that either her constitutional rights were violated or that Ofc. Crumrine and Mr. Makeley conspired to violate the same. Plaintiff simply has failed to generate any evidence of a concerted action, intended to accomplish an unlawful objective for the purpose of harming another. Therefore, summary judgment is appropriate on this cause of action.

## C.    PLAINTIFF'S STATE LAW CLAIMS

In addition to Plaintiff's federal cause of action, Plaintiff also alleges state law tort claims against Defendants. Specifically, Plaintiff is alleging: (1) battery; (2) false imprisonment; (3) intentional infliction of emotional distress; and (4) defamation. Summary judgment is appropriate on all causes of action.

M&A:05166-307 746759_1.DOC 2/24/2009 9:37 AM

MARQUIS & AURBACH
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

## 1. Plaintiff's Battery Claim Fails

In Nevada, "[t]o establish a battery claim, a plaintiff must show the act (1) intended to cause harm or offensive contact; and (2) such contact did occur." Switzer v. Rivera, 174 F. Supp. 2d 1097, 1109 (D. Nev. 2001). It is the duty of police officers acting within their prescribed powers to use such force as appears reasonably necessary in the enforcement of the law and preservation of order, and they cannot be held liable in an action for assault and battery for the use of such force on the person of another. Branch v. McGeeney, 718 A.2d 631 (Md. App. 1998). Police officers are privileged to commit battery pursuant to lawful activity, as long as the force is not excessive and is reasonable. Boyles v. City of Kennewick, 813 P.2d 178 (Wash. 1991).

Here, the only time Ofc. Crumrine touched Plaintiff was when he changed Caesar's Palace handcuffs to LVMPD handcuffs. There is no allegation of excessive force and Plaintiff admits that she has received no medical treatment as a result of any force used. (Exh. "A" at pgs. 105-07) Simply put, the fact Ofc. Crumrine is allowed to use force to handcuff Plaintiff defeats Plaintiff's battery claim. It is axiomatic that the application of handcuffs on a suspect requires some touching of the plaintiff. As such, the handcuffing of Plaintiff was privileged and Plaintiff's claim fails.

## 2. False Imprisonment

Plaintiff's state tort false imprisonment claim is identical to her Fourth Amendment illegal seizure and arrest claim. Therefore, if the Court grants summary judgment on Plaintiff's Fourth Amendment claims, Ofc. Crumrine is also entitled to summary judgment on Plaintiff's false imprisonment claims.

## 3. Intentional Infliction of Emotional Distress

Naturally, if no state law violation occurred, then Plaintiff's emotional distress claims fail as well. Nonetheless, there is no evidence that Ofc. Crumrine's conduct rises to the level necessary for Plaintiff's IIED claim to survive summary judgment. Plaintiff must establish: (1) that Defendants' conduct was extreme and outrageous; (2) that Defendants either intended or recklessly disregarded the causing of distress; (3) that Plaintiff actually suffered severe or

M&A:05166-307 746759_1.DOC 2/24/2009 9:37 AM

MARQUIS & AURBACH
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

MARQUIS & AURBACH
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

1    extreme emotional distress; and (4) that Defendants' conduct actually or proximately caused the

2    distress. Nelson v. City of Las Vegas, 99 Nev. 548, 554, 665 P.2d 1141, 1145 (1983); Chowdhry

3    v. NLVH, Inc., 109 Nev. 478, 851 P.2d 459 (1993) (physical impact required to prove negligent

4    infliction of emotional distress claim).

5         The first two elements of this tort have traditionally been examined together as their

6    interaction is what satisfies both elements and not merely their existence. As such, the inquiry is

7    whether there was extreme or outrageous conduct with either the intention of, or reckless

8    disregard for, causing emotional distress. Star v. Rabello, 97 Nev. 124, 625 P.2d 90 (1981).

9    "Liability is only found in extreme cases where the actions of the defendant go beyond all

10   possible bounds of decency, is atrocious and utterly intolerable." Hirschhorn v. Sizzler

11   Restaurants Intern., Inc., 913 F. Supp. 1393, 1401 (D. Nev. 1995). The third element for an

12   emotional distress claim requires a demonstration that the plaintiff suffered extreme emotional

13   distress.

14        Here, there is no evidence that Ofc. Crumrine's actions went "beyond all possible

15   grounds of decency." Rather, the evidence shows that Ofc. Crumrine simply performed good

16   solid police work. Ofc. Crumrine interviewed the Plaintiff and even took the time to talk to her

17   attorney about her claims - - despite no obligation to do so. Ofc. Crumrine was simply doing his

18   job.

19        In addition, Plaintiff admits that since the incident she has not received any counseling

20   and has not received any medical attention. (Exh. "A" at pg. 25) Furthermore, it is clear

21   Plaintiff understands that being trespassed and detained is a known risk of being an "advantage

22   gambler." Obviously, Plaintiff knew she may be detained and trespassed upon entering Caesar's

23   Palace as she chose to carry no identification and attempted to disguise herself. Thus, for

24   Plaintiff to claim that the detention and arrest exceeded all possible grounds of decency is

25   disingenuous.

26        **4.    Defamation**

27        According to Plaintiff's Sixth Cause of Action, Ofc. Crumrine defamed the Plaintiff by

28   transporting Plaintiff to Clark County Detention Center and by publishing a "false allegation of

Page 27 of 30

M&A:05166-307 746759_1.DOC 2/24/2009 9:37 AM

criminality to all present." (Compl. ¶¶55-62) Naturally, if Plaintiff's arrest was based upon probable cause, this claim fails. In addition, the claim fails on its merits.

To successfully prevail on a defamation claim, Plaintiff must prove that: (1) the Defendants made a false and defamatory statement concerning Plaintiff; (2) the Defendants' statements were not privileged and were published to a third party; (3) Defendants' fault amounted to at least negligence; and (4) Plaintiff suffered actual or presumed damages. Pegasus v. Reno Newspaper, Inc., 118 Nev. 706, 57 P.3d 82 (2002). As a general rule, a defamatory statement, no matter how insulting, is not actionable unless damages are proven. Branda v. Sanford, 97 Nev. 643, 646, 637 P.2d 1223, 1225 (1981). Whether a statement is capable of defamatory construction is a question of law. Lubin v. Kunin, 117 Nev. 107, 17 P.3d 422 (2001). However, it is clearly established that statements of opinion are not actionable. See Wellman v. Fox, 108 Nev. 83, 825 P. 2d 208 (1992). Therefore, separating facts from opinions is the critical inquiry for the Court. See Nevada Ind. Broadcasting Corp. v. Allen, 99 Nev. 404, 410, 664 P.2d 337 (1983). Statements determined to be fact as a matter of law are not defamatory unless they have no basis in the truth. Id.

Moreover, the Nevada Supreme Court has held that "statements made in good faith furtherance of one's official duties are generally privileged." Jordan v. State ex rel. Dept. of Motor Vehicles and Public Safety, 121 Nev. 44, 69 n. 56, 110 P.3d 30, 48 (2005), abrogated on other grounds, Buzz Stew, LLC v. City of North Las Vegas, 181 P.3d 670, 672 n. 6 (2008). It has been held that a statement by a "police officer in the performance of his official duties is deemed to be absolutely privileged." 50 Am. Jur. 2d Libel and Slander § 273 (Sept. 2008)(citing Shade v. Bowers, 199 N.E.2d 131 (Ohio C.P. 1962)).

Nevada adopted the longstanding common law rule that communications uttered or published in the course of judicial proceedings are absolutely privileged so long as they are in some way pertinent to the subject controversy. The absolute privilege precludes liability even where the defamatory statements are published with knowledge of their falsity and personal ill will toward the plaintiff. Circus Circus Hotels v. Witherspoon, 99 Nev. 56, 657 P.2d 101 (1983). The Supreme Court of Nevada has extended the privilege as to communications uttered or

M&A:05166-307 746759_1.DOC 2/24/2009 9:37 AM

MARQUIS & AURBACH
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

published in the course of judicial proceedings and extended the privilege to quasi-judicial hearings, and other official proceedings such as complaints filed with an internal affairs bureau against a police officer and even letters written in anticipation of litigation. <u>Sahara Gaming v. Culinary Workers</u>, 115 Nev. 212, 984 P.2d 164 (1999); <u>Circus Circus</u>, 99 Nev. at 61; and <u>Lewis v. Benson</u>, 101 Nev. 300, 701 P.2d 751 (1985).

In 2005, the Nevada Supreme Court clarified its prior rulings regarding statements made to police officers in <u>Pope v. Motel 6</u>, 121 Nev. 307, 114 P.3d 277 (2005). In <u>Pope</u>, the court held that communications with police officers "in aid of law enforcement as an initial step in judicial proceedings" enjoy a qualified privilege, rather than an absolute privilege. <u>Id.</u> at 317, 114 P.3d at 283. After adopting this standard, the court explained:

> Additionally, as other courts have recognized, a qualified privilege provides adequate protection against frivolous lawsuits. Under a qualified privilege, the plaintiff must prove by a preponderance of the evidence that the defendant abused the privilege by publishing the defamatory communication with actual malice. Actual malice is a stringent standard that is proven by demonstrating that "a statement is published with knowledge that it was false or with reckless disregard for its veracity."

<u>Id.</u> (citing <u>Circus Circus</u>, 99 Nev. at 62, 657 P.2d at 105; <u>Bank of America Nevada v. Bourdeau</u>, 115 Nev. 263, 982 P.2d 474 (1999); <u>Fridovich v. Fridovich</u>, 598 So. 2d 65, 69 (Fla. 1992); <u>Pegasus</u>, 118 Nev. at 722)).

Here, Ofc. Crumrine is entitled to summary judgment on Plaintiff's defamation claim because no false or defamatory statement was made. Any statement was an opinion based upon Ofc. Crumrine's determination of probable cause and therefore privileged. There is no question that Ofc. Crumrine was performing his official duty as an LVMPD police officer when Plaintiff was arrested. To argue that Ofc. Crumrine defamed Plaintiff by virtue of acting on his probable cause determination is disingenuous.

## D.  PLAINTIFF CANNOT RECOVER PUNITIVE DAMAGES

### 1.  Plaintiff's Claim for Federal Punitive Damages

Punitive damages may be awarded in a §1983 action when the individual defendant exhibited "reckless or callous disregard of, or indifference to, the rights or safety of others. . . ."

M&A:05166-307 746759_1.DOC 2/24/2009 9:37 AM

MARQUIS & AURBACH
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

See <u>Smith v. Wade</u>, 461 U.S. 30 (1983). In order to obtain punitive damages a plaintiff must show, not merely that the defendant engaged in intentional conduct, but that he did so with the intent to violate the plaintiff's federal rights, or with reckless disregard for whether his conduct would violate such rights. See <u>Iacobucci v. Boulter</u>, 193 F.3d 14 (1st Cir. 1999).

Here, there is no evidence that Ofc. Crumrine intentionally harmed Plaintiff. More important, there is no evidence of "reckless or callous disregard, or indifference." Rather, the evidence shows that Ofc. Crumrine was simply performing his police duties and he did so in a professional manner. The videotape of the incident demonstrates that Ofc. Crumrine was never rude to the Plaintiff, nor was he ever abusive. In fact, the videotape clearly shows that the only person being dishonest and reckless was Plaintiff herself.

### 2. Plaintiff Cannot Recover State Law Punitive Damages

Plaintiff's request that state law punitive damages be assessed against Ofc. Crumrine must be dismissed as a matter of law. NRS 41.035 limits an award of damages in tort against a political subdivision and specifically provides that "[a]n award may not include any amount as exemplary or punitive damages." Ofc. Crumrine, in his official capacity, is a political subdivision from which Plaintiff seeks to recover an award of damages based on tort claims. Plaintiff's claims for punitive damages against Ofc. Crumrine must therefore be dismissed as a matter of law.

## IV. CONCLUSION

Based upon the above, Ofc. Crumrine is entitled to summary judgment on all claims.

DATED this _25_ day of February, 2009.

MARQUIS & AURBACH

By: _____
Craig R. Anderson, Esq.
Nevada Bar No. 6882
10001 Park Run Drive
Las Vegas, Nevada 89145
Attorney for Defendant Crumrine

MARQUIS & AURBACH
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816